1   WO

2

3                                    **NOT FOR PUBLICATION**

4

5

6                      IN THE UNITED STATES DISTRICT COURT

7                          FOR THE DISTRICT OF ARIZONA

8

9   James C. Sell, as Receiver for American   )   No. CV-05-0684-PHX-SRB
    National Mortgage Partners, LLC and        )
10  Related Entities and as Assignee of        )   **ORDER**
    Creditors, Investors, Shareholders,        )
11  Members, Partners and Trusts of the        )
    Receivership Entities,                     )
12                                             )
              Plaintiff,                       )
13                                             )
    vs.                                        )
14                                             )
                                               )
15  Zions First Nation Bank (Utah and          )
    Idaho), a national banking association, et )
16  al.,                                       )
                                               )
17            Defendant.                       )
                                               )
18  _____

19          This case arises out an alleged Ponzi scheme perpetrated by Defendants.  At issue are

20  the following items on the docket:  a Motion to Dismiss filed by Defendant Zions First

21  National Bank and National Bank of Arizona (together, "ZNBA") (Doc. 38).  That motion

22  was joined by Defendants Paul and Carol Meka (Doc. 39), Defendant Pamela Coulter

23  ("Coulter"), both in her personal capacity and in her capacity as personal representative of

24  Darrell Coulter (Doc. 62), Defendants Mark and Bernadette Kesler (Doc. 68), Defendants

25  Larry and Sheila Dunning (Doc. 103), and Defendant Gregory Harrington (Doc. 58).  In

26  addition to joining ZNBA's Motion to Dismiss, Harrington filed his own Motion to Dismiss

27  and a Motion for Summary Judgment (Doc. 58).  Plaintiff James C. Sell, in his capacity as

28  receiver, filed a Motion to Strike the Separate Statement of Facts that Harrington filed in

1  support of his Motion for Summary Judgment (Doc. 114).  ZNBA has filed a Motion to

2  Strike the Incorporation by Reference of the Receiver's Interim Report into the First

3  Amended Complaint ("FAC") (Doc. 37), a motion that was joined by Harrington (Doc. 57),

4  Coulter (Doc. 60), and the Keslers (Doc. 70).  Coulter also filed a separate Motion to Strike

5  on the same issue (Doc. 60).  ZNBA filed a Motion to Stay Discovery pending the Court's

6  ruling on its Motion to Dismiss (Doc. 36), in which Harrington (Doc. 56), Coulter (Doc. 61),

7  and the Keslers (Doc. 69) joined.  Separate Motions to Dismiss were filed by Defendant

8  Robert Rehm (Doc. 112), Defendants Philip and Tricia Vigarino (Doc. 52), and the Mekas

9  (Doc. 32.)  The motions to dismiss are brought pursuant to Federal Rules of Civil Procedure

10  12(b)(1) and 12(b)(6).

11  **I.      FACTUAL BACKGROUND**[1]

12      The Ponzi scheme[2] at issue in this case allegedly caused more than five hundred

13  investors[3] (the "Investors") to be defrauded out of millions of dollars largely through false

14  promises of high-yield, low-risk investments in mortgage companies controlled by some of

15  the Defendants.

16      The First Amended Complaint ("FAC") divides the Defendants into three categories:

17  the Bank Defendants, the Insider Defendants and the Professional Defendants.  (FAC, ¶ 4.)

18  The Insider Defendants consist of Larry and Sheila Dunning, Frank Caspare, Robert Rehm,

19  Gregory Harrington, Paul Meka, Phillip Vigarino, Eric Strasser, Mark Kesler and Helen C.

---

20

21  [1]The following facts, which are presumed true for purposes of this Order, were drawn from the FAC and the exhibits attached thereto.  While the Court has culled some of the facts from the Receiver's Interim Report (which is Exhibit D to the FAC), they are mentioned for background purposes only and were not relied upon in any part of the Court's decision.  As will be explained below, the Receiver's Interim Report is stricken from the FAC pursuant to Federal Rules of Civil Procedure 10(c) and 12(f).

25  [2]For an interesting discussion of the history of Ponzi schemes and their creator,

26  Charles Ponzi, see *Bald Eagle Area School District v. Keystone Financial, Inc.,* 189 F.3d 321, 324 n.1 (3d Cir. 1999).

27  [3]Some of the Investors are alleged to be multiemployer employee benefit plans within

28  the meaning of ERISA.  (First Am. Compl., ¶ 162.)

Hartze.  (FAC, ¶ 4.)  The Bank Defendants are Zions First National Bank, National Bank of Arizona, Western Security Bank, Daryl Coulter and Marshall Boyce.  (FAC, ¶ 4.)  The Professional Defendants are Randy C. Kiesel and David B. Stocker.[4]  (FAC, ¶ 4.)  The Ponzi scheme is alleged to have been orchestrated by the Insider Defendants with assistance from the Professional and Bank Defendants.

The centerpiece of the Ponzi scheme was a group of mortgage lending companies (the "Receivership Entities") operated and controlled by the Insider Defendants.  Those Defendants solicited investment in their companies by lying to prospective investors.  Some of those lies included:  telling Investors that they would always receive a high rate of return on their investment with almost no risk; informing Investors that the particular company they invested in would issue real-estate loans to qualified borrowers, and that those loans would be protected by, among other things, first position liens on real property, a security device known as the "Illinois Land Trust," and a guarantee by Guaranteed Performance, Inc. ("GPI"); promising Investors that their profits would come from proceeds generated by specific real-estate transactions; allowing Investors to believe that the Receivership Entities were independent of one another; and failing to tell Investors that the people actually in control of the Receivership were felons barred from obtaining mortgage brokers' licenses by virtue of their convictions for, among other crimes, loan fraud and embezzlement.

The truth about the Receivership Entities differed dramatically from the way it was represented to the Investors:  some of the Receivership Entities were not licensed mortgage brokers; the Receivership Entities made high-risk investments backed by minimal collateral; to the extent that the Receivership Entities paid their Investors the promised rate of return, that money came not from the promised real-estate transactions but from other Investors or other sources, including other Receivership Entities; the real-estate transactions that the Receivership Entities did engage in were unsecured, defectively secured or were secured by

---

[4]The FAC also includes as Professional Defendants "Randy C. Kiesel, CPA, P.C., an Arizona professional corporation, [and] . . . David B. Stocker, Ltd., an Arizona professional corporation."  (FAC, at 1-2.)

subordinate liens; neither GPI nor the Illinois Land Trust provided meaningful investment protection; the Receivership Entities were not independent but were controlled by the Insider Defendants and operated as a common enterprise with commingled assets; the Insider Defendants forged and materially altered documents; Dunning, Harrington and Strasser, in order to conceal their felony convictions, installed figureheads, such as Caspare and Hartze, at various positions in the Receivership Entities.

The Bank Defendants furthered the Ponzi scheme by implementing loan programs with relaxed standards to prospective investors who sought funds to invest in the Receivership Entities, while failing to disclose their financial interest in the Receivership Entities. Coulter, an employee of ZNBA, "fraudulently represent[ed] to investors that they could profit on the interest spread between the rates charged by the Loan Program and the return promised by the Receivership Entities." (FAC, ¶ 57(F)(3).)

The Professional Defendants consist of an attorney and a certified public accountant. Stocker served as the attorney for the Receivership Entities, yet abdicated his responsibility to ensure that the transactions to which the Receivership Entities were parties complied with the law. Kiesel, the CPA for the Receivership Entities, submitted false financial reports to governmental agencies to create the illusion that the Receivership Entities were solvent and profitable.

The FAC provides specific examples of some typical transactions, four of which will be summarized here. One involves twenty-three loans totaling about $20 million made by several Receivership Entities (the "Castle Lenders") to Castle Megastores and its affiliates (together, "Castle"). (FAC, ¶ 64.) Defendants raised about $14 million from Investors (also, the "Castle Lenders"). (FAC, ¶ 65.) Castle eventually defaulted, yet payments were still made to Castle Lenders. (FAC, ¶¶ 67-68.) The Castle Lenders were led to believe that the money was coming from Castle's loan payments, but in fact it was coming from new Investors. (FAC, ¶ 69.) The default notwithstanding, Defendants continued to raise money from other Investors for additional loans to Castle, and in so doing, failed to disclose that Castle had defaulted on prior loans. (FAC, ¶ 71.) Defendants also led new Investors to

believe that the funds the previous Castle Lenders had been receiving came not from other sources, but from Castle's payment of the prior loans. (FAC, ¶ 64.)  While some Investors whose money was lent to Castle were repaid, others were not.  (FAC, ¶ 73.)

In another instance, a man named Herbert Fisher applied to one of the Receivership Entities, American National Mortgage Partners, LLC ("ANMP") for a loan of about $350,000, and signed a promissory note to ANMP for the requested amount (FAC ¶¶ 74-75.) To raise the funds for that loan, various Insider Defendants solicited money from Investors (the "Fisher Investors"), who were promised that their investment would be secured by a first position lien on twelve town homes, and that the return on their investment would come from the proceeds of the loan.  (FAC, ¶¶ 76-77.)  The Insider Defendants formed an entity, Thomas Townhouses, LLC, to carry out the business related to the loan.  (FAC, ¶ 79.) $40,000, representing what was purported to be the loan deposit, was placed in escrow by ANMP.  (FAC, ¶ 80.)

Events did not transpire as the Insider Defendants had promised.  No loan was ever made to Fisher; the escrow was cancelled; the $40,000 was returned to ANMP, commingled with the assets of other Receivership Entities, and used for the benefit of the Insider Defendants; the Fisher Investors were not informed that the loan was never made, and on three occasions, they received money from the Insider Defendants which was represented to be "interest" payments on the loan, but was actually money contributed by different Investors to other bogus ventures.  (FAC, ¶¶ 81-86.)  The Fisher Investors received no other return on their investments.  (FAC, ¶ 87.)

The third example given in the FAC describes how one of the Bank Defendants relaxed its lending criteria to enable an unqualified borrower to take out a loan to invest in one of the Receivership Entities.  Investor Luther Durant, a man with only $3,700 in liquid assets, applied to NBA for a $100,000 loan which he sought to invest with the Receivership Entities. (FAC, ¶¶ 88-89.)  Coulter, the NBA employee who handled the transaction, ensured that Durant received the loan by relaxing NBA's lending criteria and by failing to properly

1    perform due diligence.  (FAC, ¶¶ 90-91.)  The investment did not bear fruit, and Durant was

2    unable to repay NBA.  (FAC, ¶ 92.)

3           A fourth example depicts the fraudulent methods employed by some of the Defendants

4    to secure a loan to purchase some property in Sedona, Arizona.  One of the Receivership

5    Entities maintained a bank account at Western Security Bank.  (FAC, ¶ 95.) Western

6    Security, through its agent Boyce, issued a $400,000 cashier's check on that account, despite

7    knowing that the account had insufficient funds to cover that amount. (FAC, ¶¶ 95-96.)  The

8    Receivership Entities used that money to obtain a loan from ZNBA to purchase some

9    property in Sedona.  (FAC, ¶¶ 97-98.)  ZNBA relaxed its normal lending procedures to

10   ensure that the Receivership Entities qualified for the loan. (FAC, ¶ 99.)  It appears that the

11   Receivership Entities were unable to repay the loan.

12   **II.   PROCEDURAL HISTORY**

13          On March 24, 2003, the Arizona Corporation Commission ("ACC") filed a Verified

14   Complaint (the "ACC Complaint") in Maricopa County Superior Court against the

15   Receivership Entities and against all of the Defendants with the exception of ZNBA, Coulter,

16   Harrington, Western Security Bank, Boyce, Hartze and Kiesel.  The ACC Complaint alleges

17   violations of state law, including the offer and sale of unregistered securities in violation of

18   Arizona Revised Statutes ("A.R.S.") § 44-1841, the sale of securities by an unregistered

19   dealer or salesman in violation of A.R.S. § 44-1842, and fraud in connection with the offer

20   or sale of securities in violation of A.R.S. § 44-1991.  The ACC Complaint also asks the

21   Superior Court to appoint a receiver to take control of the assets of the more than one

22   hundred named Receivership Entities.  The Superior Court appointed a receiver, Plaintiff

23   James C. Sell.

24          On March 10, 2003, about two weeks before the filing of the ACC Complaint, two of

25   the Receivership Entities, ANMP and ANMP 74th Street (together, "ANMP"), filed for

26   Chapter 11 protection in the United States Bankruptcy Court.  The ANMP bankruptcy

27   proceedings were consolidated, and on July 18, 2005, the Bankruptcy Court consolidated the

28

ANMP proceedings with the Receivership Entities for purposes of any distributions provided for in the Plan of Reorganization in the ANMP Chapter 11 proceedings.

Next, the Receiver sought permission from the Superior Court to commence certain actions on behalf of the "Receivership Entities, their non-objecting, non-insider creditors, investors, shareholders, members, partners and trusts." (FAC, Ex. C.)  The Receiver also moved for an order confirming that the "Defrauded Parties have validly assigned their rights to such actions to the Receiver and that they have agreed to execute any subsequent assignment documents to evidence same." (FAC, Ex. C.)

The Superior Court, in an Order dated March 1, 2005, granted the Receiver's motion, and ordered that:

. . .

(2) The Receiver has the authority to commence actions on behalf of the Defrauded Parties;

(3) The Receiver is the assignee of the rights and claims of the Defrauded Parties, by virtue of the Motion, and has the authority to commence, maintain, and bind the Defrauded Parties to any settlements of the Actions, . . .

(4) The Defrauded Parties have validly assigned their rights to such actions to the Receiver and that they have agreed to execute any subsequent assignment documents to evidence same;

. . .

(6) The Receiver is the proper party in interest to bring the Actions; and

(7) Notwithstanding this Order, any Defrauded Party who has 'Opted-Out' of the Motion shall retain the right to independently pursue claims against any and all third parties such party deems responsible.

(FAC, Ex. C.)

1   The present action is the consequence of the March 1, 2005 Order.  The Receiver

2   wasted no time, filing his Complaint with this Court the next day.  Amended on June 10,

3   2005, the FAC contains seventeen causes of action, thirteen of which are based on state law.

4   The FAC is alleged to stand on two jurisdictional legs:  the Racketeer Influenced and

5   Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO") and the Employee Retirement

6   Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"), as amended by the

7   Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381-1453

8   ("MPPAA").  Whether those legs can in fact stand, as Plaintiff contends, or whether they

9   buckle and fall and bring down with them the remainder of the FAC, as Defendants argue,

10  are the central issues of the pending motions to dismiss.

11  **III.   LEGAL STANDARDS AND ANALYSIS**

12  **A.   Motion to Strike Receiver's Interim Report**

13  Paragraph 139 of the FAC incorporates by reference the Receiver's Interim Report,

14  which is attached to the FAC.  ZNBA has filed a motion, joined by other Defendants, to

15  strike both paragraph 139 as well as the Receiver's Interim Report.  According to the motion,

16  paragraph 139 is "immaterial" within the meaning of Federal Rule of Civil Procedure 12(f),

17  and the Receiver's Interim Report is not a "written instrument" within the meaning of Rule

18  10(c).  The Court agrees with Defendants on both points.

19  Rule 10(c) provides that "[s]tatements in a pleading may be adopted by reference in

20  a different part of the same pleading or in another pleading or in any motion.  A copy of any

21  written instrument which is an exhibit to a pleading is a part thereof for all purposes."  In

22  other words, for present purposes, the rule authorizes a complaint to incorporate by reference

23  a "written instrument" that is attached to the complaint as an exhibit.

24  The Receiver's Interim Report is not a "written instrument" within the meaning of

25  Rule 10(c).  Courts have interpreted the term "written instrument" to mean "a document

26  evidencing legal rights or duties or giving formal expression to a legal act or agreement, such

27  as a deed, will, bond, lease, insurance policy or security agreement." *DeMarco v. DepoTech*

28  *Corp.,* 149 F. Supp. 2d 1212, 1220 (S.D. Cal. 2001) (quotations and citations omitted).  Such

1    documents "consist largely of documentary evidence, specifically, contracts, notes, and other

2    writings on which a party's action or defense is based[.]" *Id.* (quoting *Rose v. Bartle,* 871

3    F.2d 331, 339 n.3 (3d Cir. 1989)).

4           The Receiver's Interim Report, however, does not evidence any legal rights or duties,

5    nor does it give formal expression to a legal act or agreement. The Report is simply an

6    expanded version of the FAC. Both are summaries that were prepared by Plaintiff (or his

7    lawyer) and set forth Plaintiff's view of how he believes the Ponzi scheme transpired and the

8    role of the various Defendants therein. Whereas the FAC is fifty-two pages double-spaced,

9    the Report consists of sixty-two single-spaced pages and contains one thousand one hundred

10    pages of exhibits. As the Report fails to meet the definition of a "written instrument" as that

11    term is defined in Rule 10(c), it is stricken from the FAC. *See United States v. Ritchie,* 342

12    F.3d 903, 908 (9th Cir. 2003) ("The doctrine of incorporation by reference may apply, for

13    example, when a plaintiff's claim about insurance coverage is based on the contents of a

14    coverage plan, or when a plaintiff's claim about stock fraud is based on the contents of SEC

15    filings. . . . Affidavits and declarations . . . are not allowed as pleading exhibits unless they

16    form the basis of the complaint.") (citations omitted); *Swanson v. United States Forest Serv.,*

17    87 F.3d 339, 343-45 (9th Cir. 1996); *Perkins v. Silverstein,* 939 F.2d 463, 467 n.2 (7th Cir.

18    1991) (noting that "newspaper articles [and] commentaries . . . are not the type of

19    documentary evidence or 'written instrument[s]' which [Rule 10(c)] intended to be

20    incorporated into, and made a part of, the complaint") (citations omitted). None of the cases

21    Plaintiff cites alter or have any effect on that conclusion. Also, as the Report is stricken from

22    the FAC, paragraph 139 of the FAC, which refers the reader to that Report, is also stricken.

23           In his response, Plaintiff asks the Court, in the event that it believes that the Report

24    should be stricken, for permission to amend the Complaint again "for the purpose of cutting

25    and pasting the facts set forth in the Receiver's Report directly into the Complaint." (Pl.'s

26    Opp'n to ZNBA's Mot. to Strike, at 2.) That request, as it is phrased, is denied, as it

27    essentially asks the Court to allow Plaintiff to add the contents of a sixty-two page single-

28    spaced document with over one thousand pages of exhibits to an already lengthy fifty-two

page document.  Such an amendment would make a mockery of Federal Rule of Civil Procedure 8's requirement that a complaint contain but a "*short* and plain statement of the claim." (emphasis added).  If there are particular facts that are contained in the Report that Plaintiff feels should be included if an amended Complaint is filed, he may add them, but is advised to do so judiciously.

It is also worth noting that the Court's conclusions in this Order as to whether Plaintiff has stated a claim under RICO or ERISA would be the same regardless of whether the Report was stricken from the FAC.

### B.    Authority of Receiver

ZNBA raises the issue of whether Plaintiff has the requisite authority and the standing in his capacity as receiver to commence these actions.  The Court will not reach those issues, as even assuming that Plaintiff did have such authority and standing, all of his claims must still be dismissed for the reasons stated below.

### C.    Federal Jurisdiction

ZNBA moves for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the FAC fails to state a claim under both RICO and ERISA.

### 1.    Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) dismissal for failure to state a claim can be based on either:  (1) the lack of a cognizable legal theory, or (2) insufficient facts to support a cognizable legal claim. *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990); *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 534 (9th Cir. 1984).

In determining whether a complaint states a valid claim, all allegations of material fact are taken as true and construed in the light most favorable to the non-moving party.  *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir. 1994).  The complaint should not be dismissed unless it appears beyond doubt that there are "no set of facts" that would entitle the plaintiff to relief under the asserted claim.  *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S. Ct. 99, 103 (1957); *see also Balistreri,* 901 F.2d at 701.

### 2.    RICO

1    The issue is whether Plaintiff can state a claim under RICO[5] in light of the enactment

2    in 1995 of the Private Securities Litigation Reform Act ("PSLRA"), which barred the use of

3    securities fraud as a predicate civil RICO offense.

4    Section 107 of the PSLRA amended the civil RICO statute, and it now states, in

5    relevant part, "Any person injured in his business or property by reason of a violation of

6    section 1962 of this chapter may sue therefor in any appropriate United States district court

7    and shall recover threefold the damages he sustains and the cost of the suit, including a

8    reasonable attorney's fee, *except that no person may rely upon any conduct that would have*

9    *been actionable as fraud in the purchase or sale of securities to establish a violation of*

10   *section 1962.*"  18 U.S.C. § 1964(c) (emphasis added).[6]

11   ZNBA and the Defendants who have joined ZNBA's motion argue that all of the

12   allegations contained in the FAC would have been actionable as fraud in the purchase or sale

13   of securities, and therefore, none of those allegations can form the basis of a civil RICO

14   claim.  Plaintiff makes two responses, each of which will be addressed in turn: the first is that

15   it cannot be determined from the face of the FAC whether Defendants were engaged in the

16   sale of securities; the second is that the FAC alleges predicate acts that have no relation to

17   securities fraud and therefore may serve as predicate offenses under the civil RICO statute.

18        **a.    Whether Defendants Were Engaged in the Sale of**

19             **Securities**

20

21   _____

22   [5]"RICO provides for civil and criminal liability for entities engaged in a 'pattern of
racketeering activity.'  18 U.S.C. § 1961(a)-(d).  A person who suffers injury as a result of

23   a RICO violation may sue an entity pursuant to 18 U.S.C. § 1964.  To demonstrate a 'pattern'

24   of racketeering activity, a plaintiff must show at least two predicate acts of racketeering
activity occurring within a ten-year period.  18 U.S.C. § 1961(5)."  *Blythe v. Deutsche Bank*

25   *AG,* 399 F. Supp. 2d 274 (S.D.N.Y. 2005).

26   [6]While the FAC contains three separate causes of action allegedly arising under the
civil RICO statute, all three may be dismissed if it can be said as a matter of law that all of

27   Plaintiff's allegations "rely on conduct that would have been actionable as fraud in the

28   purchase or sale of securities."

1    Plaintiff argues that the question of whether the agreements between the Receivership

2  Entities and the Investors constitute "investment contracts," a type of security,[7] "would

3  require a fact-intensive inquiry" and cannot be resolved at this stage of the litigation.  (Pl.'s

4  Resp. to Mot. to Dismiss at 12.)[8]

5    The parties agree that *S.E.C. v. Howey*, 328 U.S. 293, 299, 66 S. Ct. 1100, 1103

6  (1946) controls this inquiry.  In *Howey*, the Supreme Court defined an "investment contract"

7  as any "contract, transaction or scheme whereby a person invests his money in a common

8  enterprise and is led to expect profits solely from the efforts of the promoter or third party."

9  *Id.* at 298-99, 66 S. Ct. at 1103.  That definition has been "distilled" into a three-part test

10  requiring "(1) an investment of money (2) in a common enterprise (3) with an expectation

11  of profits induced by the efforts of others." *Rubera,* 350 F.3d at 1090 (quoting *S.E.C. v. R.G.*

12  *Reynolds Enters., Inc.,* 952 F.2d 1125, 1130 (9th Cir. 1991)).

13    Curiously, while Plaintiff argues that it is not possible to resolve definitively from the

14  face of the FAC whether the arrangements between the Investors and the Receivership

15  Entities constitute "investment contracts," he does not point to where he believes the

16  ambiguities lie.  Nor can the Court find any.  There was clearly "an investment of money."

17  *See, e.g.,* FAC, ¶¶ 5, 8-12, 45-50, 52, 54, 57.  The Receivership Entities were common

18  enterprises.  *See, e.g.,* FAC, ¶¶ 64-65, 69-70, 76-79, 82-83, 85, 101-104; *S.E.C. v. Alliance*

19  *Leasing Corp.,* 28 Fed. Appx. 648, 651 (9th Cir. 2002) (noting that a common enterprise

20  existed where the defendant "pooled investors' interests and [the defendant] and the investors

21  shared profits").  As to the third element, the Ninth Circuit has elaborated that, "[w]e have

22  rejected a strict interpretation of this prong in favor of a more flexible focus on 'whether the

23

24    [7]The Securities Act of 1933 defines a "security" as, among other things, an
  "investment contract." *See* 15 U.S.C. §§ 77b(a)(1), 78c(a)(1) (2003); *S.E.C. v. Rubera,* 350

25  F.3d 1084, 1090 (9th Cir. 2003).

26    [8]As the Court pointed out at oral argument, it is somewhat ironic that Plaintiff, who
  was appointed to his position as receiver because of alleged violations by the Receivership

27  Entities of Arizona's securities laws, now makes the argument that the Receivership Entities

28  were not actually involved in the sale of securities.

efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Rubera,* 350 F.3d at 1092 (quoting *S.E.C. v. Glenn W. Turner Enters.,* 474 F.2d 476, 482 (9th Cir. 1973) (citation omitted)).  In *Rubera,* the Ninth Circuit found that the third prong had been satisfied where

> [t]he investors in Mr. Rubera's telephone investment program were passive, completely relying on Alpha to select a suitable location for the telephone, install the pay telephone, maintain the telephone, pay all monthly telephone and utility bills, as well as obtain all regulatory certifications.  These functions were all crucial to the profitability of the investments in the pay telephones, and, concomitantly, to the success of the investment program as a whole.  The entire scheme hinged on Alpha's efforts, managerial skills, and . . . continued solvency.

*Rubera,* 350 F.3d at 1092.

The same is true in the present action.  The Investors in the Receivership Entities were passive, completely relying on the various Defendants to conduct all aspects of the business, as well as obtain all mortgage lending certifications and licenses, and submit to the state all financial statements and audit reports.  *See, e.g.,* FAC, ¶¶ 6 (alleging that the Insider Defendants "systematically manipulated the Receivership Entities' financial statements and misstated their financial condition, commingled assets and liabilities . . . and otherwise *dominated and controlled* the Receivership Entities to use them as a vehicle for the scheme") (emphasis added), 7-14, 45-63.  There is no question that these functions are alleged to be crucial to the profitability of the Receivership Entities and the success of the investments as a whole.  The entire scheme hinged on the efforts and managerial skills of the various Defendants and particularly the Insider Defendants.  As such, it is clear from the face of the FAC that the arrangements between the various Defendants and the Investors constitute "investment contracts."

**b.      Whether the FAC Alleges Predicate Acts Other Than Securities Fraud**

As mentioned above, § 107 of the PSLRA amended the civil RICO statute to disqualify from use as a predicate offense "any conduct that would have been actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). The viability of Plaintiff's RICO claims turn on whether the FAC alleges any conduct that would *not* be actionable as fraud in the purchase or sale of securities.

The PSLRA was enacted not only to "deprive plaintiffs of the right to bring securities fraud based RICO claims," *Scott v. Boos,* 215 F.3d 940, 945 (9th Cir. 2000), but also to "prevent a plaintiff from 'plead[ing] other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such offenses are based on conduct that would have been actionable as securities fraud." *Bald Eagle Area Sch. Dist.,* 189 F.3d at 327 (3d Cir. 1999) (quoting H.R. Conf. Rep. No. 104-369, at 47 (1995)). *See also Blythe,* 399 F. Supp. 2d at 274; *Ling v. Deutsche Bank AG,* 2005 WL 1244689, at *3 (S.D.N.Y. May 26, 2005); *Seippel v. Jenkens & Gilchrist, P.C.,* 341 F. Supp. 2d 363, 372 (S.D.N.Y. 2004) ("In amending RICO, Congress was clear in stating that the PSLRA was meant to eliminate the possibility that litigants might frame their securities claims under a mail or wire fraud claim.") (quoting *Jordan (Berm.) Inv. Co. v. Hunter Greem Invs. Ltd.,* 205 F. Supp. 2d 243, 248 (S.D.N.Y. 2002)); *Swartz v. KPMG, LLC,* 401 F. Supp. 2d 1146, 1151 (W.D. Wash. 2004) ("The rule that a plaintiff cannot assert a RICO claim based on predicate acts that sound in securities fraud is applicable even if, as is the case here, the claim is pled as a matter of mail fraud or wire fraud.") (citing *Howard v. Am. Online, Inc.,* 208 F.3d 741, 749-50 (9th Cir. 2000)).

With that backdrop, the Court turns to the interpretation of the term "conduct . . . actionable as fraud in the purchase or sale of securities." 18 U.S.C. § 1964(c). Helpful in this regard is the Supreme Court's interpretation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, which make it "unlawful for any person . . . [t]o use or employ, *in connection with* the purchase or sale of any security," "any device, scheme, or artifice to defraud." *See S.E.C. v. Zandford,* 535 U.S. 813,

122 S. Ct. 1899 (2002) (emphasis added).  In *Zandford*, the Court endorsed the SEC's "broad reading" of that phrase, and held that "it is enough that the scheme to defraud and the sale of securities coincide." *Id.* at 820, 122 S. Ct. at 1903.  In that case, the defendant, a securities broker, was alleged to have "made sales of his customer's securities for his own benefit." *Id.* at 820, 122 S. Ct. at 1903.  He argued that he had not committed fraud "in connection with" the sale of securities because the "sales themselves were perfectly lawful," and were not "in connection with" the subsequent misappropriation of the proceeds from those sales.  The Court rejected that argument, because

> [T]he securities sales and the respondent's fraudulent practices were not independent events.  This is not a case in which, after a lawful transaction had been consummated, a broker decided to steal the proceeds and did so.  Nor is it a case in which a thief simply invested the proceeds of a routine conversion in the stock market.  Rather, the respondent's fraud coincided with the sales themselves. . . . [E]ach sale was made to further respondent's fraudulent scheme. . . .  In the aggregate, the sales are properly viewed as a course of business that operated as a fraud or deceit on a stockbroker's customer.

*Id.* at 820-21, 122 S. Ct. at 1904.

The terms "in connection with . . . any . . . scheme . . . to defraud," and "actionable as fraud in the . . . sale of securities," at first glance, do not appear to appear to perfectly overlay, but on closer analysis, they do.  This is because:

(1) It is a violation of Section 10(b) and Rule 10b-5 to commit fraud "in connection with" the purchase or sale of any security;

(2) If one violates Section 10(b) and Rule 10b-5, they have committed securities fraud;

(3) Therefore, one way to define securities fraud is fraud in connection with the sale of any security.

(4) Conduct that would have been actionable as fraud in the purchase or sale of securities may not serve as a predicate offense under the civil RICO statute;

(5) Conduct that would have been actionable as fraud in the purchase or sale of securities is conduct for which one could be found liable for of securities fraud;

(6) Therefore, conduct that is actionable as securities fraud is conduct that occurred in connection with the sale of securities.

The appropriate inquiry then becomes whether all of the allegations in the FAC occurred "in connection with" the sale of securities. *See Bald Eagle,* 189 F.3d at 330; *Blythe,* 399 F. Supp. 2d at 274; *Ling,* 2005 WL 1244689, at *3; *Seippel,* 341 F. Supp. 2d at 372-74. ZNBA's motion contends that the heart of the FAC is the Ponzi scheme, and the heart of the Ponzi scheme is securities fraud, and while there may be other predicate acts alleged, they were performed "in connection with" the Ponzi scheme, and must therefore be dismissed. Plaintiff counters that the FAC alleges four predicate acts, none of which occurred in connection with securities fraud:  wire fraud in violation of 18 U.S.C. § 1343, mail fraud in violation of 18 U.S.C. § 1341, and bank fraud and conspiracy to commit bank fraud in violation of 18 U.S.C. § 1344.  Each of these allegedly independently predicate acts will be discussed in turn.

### 1.      Mail and Wire Fraud

According to Plaintiff, some of the Defendants committed wire and mail fraud by causing distributions to be made to the Investors.  These distributions were fraudulent because whereas Defendants told the Investors that the money they were receiving was the fruit of "bona fide, existing and performing loans," the money had been obtained from other Investors who believed they too were investing in "bona fide, existing and performing loans." (Pl.'s Resp. to Mot. to Dismss at 12.)  Also, Plaintiff alleges that the Professional Defendants committed wire and mail fraud by submitting "false and misleading audit reports to the Arizona Banking Department," as part of another one of Defendants' bogus investment schemes.

1    Plaintiff makes the argument that when viewed in isolation, the predicate acts
2  themselves have nothing to do with securities fraud.  In other words, according to Plaintiff,
3  because the predicate acts, in effect, state a claim for wire fraud and bank fraud, they do not
4  constitute securities fraud.

5    Plaintiff's argument, however, "ignores the reality that the same set of facts can
6  support convictions for mail fraud, wire fraud, bank fraud and securities fraud without giving
7  rise to any multiplicity problems."  *Bald Eagle,* 189 F.3d at 330 (citing *United States v.*
8  *Faulhaber,* 929 F.2d 16 (1st Cir. 1991); *United States v. Reed,* 639 F.2d 896 (2d Cir. 1981)).
9  As mentioned above, the question is not whether a plaintiff can state a claim under a non-
10  securities-related predicate act, but whether the allegations that form the basis of that
11  predicate act occur "in connection with" securities fraud.

12    Here, they do.  In fact, it is hard to imagine just how any predicate acts could be more
13  connected to a Ponzi scheme than those just discussed.  This Ponzi scheme, like seemingly
14  all Ponzi schemes, functioned by duping investors to give money for what they believe is one
15  type of investment but is actually another, and some of those investors sometimes receive
16  what they are promised, only it does not come from where they think it does, but from other,
17  more recent, investors.  The disbursement of money from more recent investors to older
18  investors is the hallmark of the scheme.  Those disbursements are, in other words, "in
19  connection with" securities fraud.

20    The same is true for the submission of false financial documents to state agencies.  If
21  the state knew how the Receivership Entities operated, they would have been, like they
22  eventually were, sued under securities fraud laws and placed in receivership.  Thus, it was
23  essential to the Ponzi scheme to keep the state in the dark, a feat that was accomplished for
24  at least a little while through the submission of false documents to the state.

25    As such, the wire fraud and mail fraud events to which Plaintiff points as allegedly
26  independent of securities fraud were, to the contrary, part and parcel of it.  *Bald Eagle,* 189
27  F.3d at 330 (holding that the plaintiff's allegations of wire fraud and mail fraud as potential
28  predicate acts under RICO were barred by the PSLRA because they were undertaken "in

connection with the purchase and sale of securities"); *Seippel,* 341 F. Supp. 2d at 372-74 (barring the use of wire fraud and mail fraud as predicate offenses where the allegations underlying those causes of action were "part of a single fraudulent scheme," and as such, the plaintiffs "cannot now divide the scheme into its various component parts," an act of "surgical presentation" that "would undermine the congressional intent behind the RICO amendment"); *Ling,* 2005 WL 1244689, at *3 (dismissing the plaintiff's RICO claim where the predicate acts of wire fraud and mail fraud were "in connection with securities fraud"); *Swartz,* 401 F. Supp. 2d at 1151 ("The rule that a plaintiff cannot assert a RICO claim based on predicate acts that sound in securities fraud is applicable even if, as is the case here, the claim is plead as a matter of mail fraud or wire fraud.") (citing *Howard,* 208 F.3d 749-50). *See Zandford,* 535 U.S. at 820, 122 S. Ct. at 1903 (holding that an act is "in connection with" securities fraud if it is temporally coincident with securities fraud and occurs during "a 'course of business' that operated as a fraud"). Therefore, § 107 of the PSLRA precludes the use of Plaintiff's wire fraud and mail fraud claims as predicate acts under the civil RICO statute.

### 2. Bank Fraud/ Conspiracy to Commit Bank Fraud

Plaintiff gives two examples of bank fraud/conspiracy to commit bank fraud that he alleges were independent of securities fraud. Both involve various Defendants, acting on behalf of the Receivership Entities, defrauding banks to obtain loans to purchase properties for the Receivership Entities. However, these allegations are but tentacles of the same octopus, sufficiently connected to securities fraud to bar their use as predicate acts.

The Insider Defendants created over one hundred companies fueled by the money of defrauded Investors. The act of defrauding a bank to further several of those entities is not independent of the Ponzi scheme, but clearly in furtherance of it. *Id.* at 820, 122 S. Ct. at 1903 (finding that an act was "in connection with" securities fraud where, among other reasons, the act was committed "to further [the] . . . fraudulent scheme," and the act and the securities fraud were not "independent events"). As in *Zandford,* Defendants' allegedly

independent acts "are properly viewed as a course of business" which included securities fraud. *See also Bald Eagle,* 189 F.3d at 330 ("[c]onduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase and sale of securities"); *Ling,* 2005 WL 1244689, at *3 (holding that the plaintiff's bank fraud could not serve as a predicate act in light of the PSLRA). As such, Plaintiff's bank fraud/conspiracy to commit bank fraud claims cannot be used as predicate acts.

In sum, all of the predicate acts that Plaintiff has alleged were committed "in connection with" securities fraud, which is to say that they are "actionable as fraud in the . . . sale of securities," and are therefore barred by the PSLRA. Having failed to plead a requisite predicate act, all of Plaintiff's RICO claims are dismissed.[9]

### 3.   ERISA

Plaintiff brings his ERISA claim pursuant to 29 U.S.C. § 1451(a)(1). That subsection, which falls beneath the heading "Persons entitled to maintain actions," states, "A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, or an employee organization which represents such a plan participant or beneficiary for purposes of collective bargaining, may bring an action for appropriate legal or equitable relief, or both."

ZNBA argues that even assuming Plaintiff meets the strictures of §1451, that provision is simply one of standing; in other words, it does not "create a private cause of action under ERISA for 'fraudulent acts and omissions' generally." (ZNBA's Mot. to Dismiss at 14.) The MPPAA, of which § 1451 is a part, concerns the liability of an employer who

---

[9]ZNBA's Motion to Dismiss, as well as those filed by other Defendants, raise other arguments as to why the RICO claims should be dismissed from the FAC. In light of the Court's conclusion that § 107 of the PSLRA bars Plaintiff's RICO claims, the Court need not and does not address those arguments.

1   withdraws from a multiemployer pension plan.  29 U.S.C. § 1383.  According to ZNBA, the

2   FAC is devoid of any allegation relating to withdrawal liability.

3          ZNBA is correct.  In *Bay Area Laundry & Dry Cleaning Pension Trust Fund v.*

4   *Ferbar Corporation of California,* 522 U.S. 192, 203, 118 S. Ct. 542, 550 (1997), the United

5   States Supreme Court stated that,

6          [Section] 1451(a)(1) does not provide a cause of action in the air for

7          *any* adverse effect on multiemployer pension funds. . . .  Section 1451

8          prescribes a variety of procedures for the governance of civil actions

9          brought to enforce the MPPAA.  Subsection (a), headed '[p]ersons

10         entitled to maintain actions,' answers only a 'standing' question - *who*

11         may sue for a violation of the obligations established by the Act's

12         substantive provisions.  Subsection (a)(1) extends judicial remedies for

13         violation of the MPPAA to a broad range of plaintiffs--any 'plan

14         fiduciary, employer, plan participant, or beneficiary, who is adversely

15         affected.' But that provision does not make an 'adverse effect' unlawful

16         *per se,* any more than does § 10(a) of the Administrative Procedure

17         Act, which similarly empowers 'adversely affected' persons to invoke

18         judicial remedies.

19   (emphasis in original) (some internal punctuation and citations omitted).  *See Berwind Corp.*

20   *v. Apfel,* 94 F. Supp. 3d 597, 613 (E.D. Pa. 2000) ("[Section] 1451 creates a private cause of

21   action under ERISA *only* for violations of 29 U.S.C. §§ 1381 through 1453.") (emphasis

22   added) (citing *Steiner Elec. Co. v. Cent. States, S.E. & S.W. Areas Pension Fund,* 1995 WL

23   399517, at *6 (N.D. Ill. June 29, 1995)).

24         The "substantive provisions" of the MPPAA concern, as ZNBA points out, the

25   ramifications for an employer if it chooses to withdraw from a multiemployer pension plan.

26   *See, e.g.,* 29 U.S.C. §§ 1382, 1391, 1399; *S.E. & S.W. Areas Pension Fund v. T.I.M.E. - DC,*

27   *Inc.,* 826 F.2d 320, 321 (5th Cir. 1987) (noting that the intent of the MPPAA was to "reduce

28   the burden of employer withdrawals upon a plan and remaining employers by requiring that

- 20 -

an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan") (citations and internal punctuation omitted).  The FAC contains no allegations of anything pertaining to withdrawal liability, nor does the word "withdrawal" even appear in the FAC.  In fact, the word "multiemployer" seems to appear only once in the FAC, in the following statement: "The Plans include, *inter alia,* multiemployer plans as defined under ERISA."  (FAC, ¶ 162.)  Given the absence of allegations concerning withdrawal liability, the FAC fails to state a claim under ERISA, and that count is dismissed from the FAC.

### 4.   Supplemental Jurisdiction

Given that Plaintiff has failed to state a claim under either RICO or ERISA, the only remaining counts arise under state law.  As such, the Court has discretion as to whether to exercise supplemental jurisdiction over those claims.  *Herman Family Revocable Trust v. Teddy Bear,* 254 F.3d 802, 805-06 (9th Cir. 2001).  The Court declines to exercise supplemental jurisdiction, and the state law claims are dismissed.

### 5.   Miscellaneous

The Motions to Dismiss as well as Harrington's Motion for Summary Judgment argue that, even assuming Plaintiff had the requisite authority and standing as receiver to commence this action, and even assuming that the FAC had stated a claim under ERISA and RICO, the state law claims should still be dismissed for failure to state a claim.  In light of the Court's conclusion that Plaintiff has failed to state a claim under ERISA and RICO, the Court need not address any of Defendants' arguments concerning the state law claims.

### D.   Motion to Stay Discovery

Defendants ask that discovery be stayed pending the Court's ruling on the instant motions to dismiss.  Because this Order dismisses the FAC, it is a moot point whether discovery should be stayed.

## IV.   CONCLUSION

1       This action is dismissed without prejudice.  The FAC alleged subject matter
2   jurisdiction under RICO and ERISA.  However, as Plaintiff has failed to state a claim under
3   both of those statutes, counts one through four are dismissed.  The remaining state law claims
4   are dismissed as well, as the Court has declined to exercise supplemental jurisdiction over
5   them.

6       **IT IS ORDERED** granting the Motion to Strike the Incorporation by Reference of
7   the Receiver's Interim Report into the First Amended Complaint filed by ZNBA (Doc. 37)
8   and joined by some of the other Defendants.

9       **IT IS FURTHER ORDERED** granting the Motion to Strike the Incorporation by
10  Reference of the Receiver's Interim Report into the First Amended Complaint filed by
11  Coulter (Doc. 60).

12      **IT IS FURTHER ORDERED** granting the Motion to Dismiss filed by ZNBA (Doc.
13  38).  As that motion was joined by Defendants Paul and Carol Meka (Doc. 39), Defendant
14  Pamela Coulter, both in her personal capacity and in her capacity as personal representative
15  of Darrell Coulter (Doc. 62), Defendants Mark and Bernadette Kesler (Doc. 68), Defendants
16  Larry and Sheila Dunning (Doc. 103), and Defendant Gregory Harrington (Doc. 58), the case
17  is dismissed as to those parties as well.

18      **IT IS FURTHER ORDERED** granting Defendant Gregory Harrington's Motion to
19  Motion to Dismiss (Doc. 58).  His Motion for Summary Judgment will not be considered at
20  this time as it was prematurely filed.

21      **IT IS FURTHER ORDERED** denying as moot Plaintiff James C. Sell's Motion to
22  Strike the Separate Statement of Facts that Harrington filed in support of his Motion for
23  Summary Judgment (Doc. 114).

24      **IT IS FURTHER ORDERED** denying as moot the Motion to Stay Discovery filed
25  by ZNBA (Doc. 36) and joined by Harrington (Doc. 56), Coulter (Doc. 61), and the Keslers
26  (Doc. 69).

27      **IT IS FURTHER ORDERED** granting the Motion to Dismiss filed by Defendant
28  Robert Rehm (Doc. 112).

1      **IT IS FURTHER ORDERED** granting the Motion to Dismiss filed by Defendants

2  Philip and Tricia Vigarino (Doc. 52).

3      **IT IS FURTHER ORDERED** granting the Motion to Dismiss filed by Paul and

4  Carol Meka (Doc. 32).

5      **IT IS FURTHER ORDERED** that if Plaintiff believes there is some other basis for

6  the assertion of federal jurisdiction, he may file an amended Complaint within 20 days of this

7  Order.

8

9      DATED this 9th day of February, 2006.

10

11

12  _____

13          Susan R. Bolton
         United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28